[No. B181246. Second Dist., Div. One. July 10, 2006.]

SHASHIKANT JOGANI, Plaintiff and Appellant, v.
HARESH JOGANI et al., Defendants and Respondents.

## COUNSEL

Horvitz & Levy, Frederic D. Cohen, Andrea M. Gauthier; Krane & Smith and Samuel Krane for Plaintiff and Appellant.

Jones Day, Elwood Lui, Scott D. Bertzyk and Karin L. Bohmholdt for Defendants and Respondents.

## OPINION

**MALLANO, J.**—In 1995, plaintiff allegedly entered into an oral partnership agreement to manage his brothers' real estate business. According to plaintiff, he was eventually to receive 50 percent of the partnership's "profits, proceeds, and value" if he succeeded in recouping his brothers' investment plus a 12 percent return. Plaintiff contends he accomplished that goal in 2001 but was not paid in accordance with the partnership agreement. In 2003, he filed this action against his brothers, other relatives, and their real estate companies, seeking $250 million.

Meanwhile, in the 1990's, plaintiff's own business pursuits resulted in several lawsuits and judgments against him. In connection with two of the judgments, he testified at judgment debtor examinations in 1998. During the examinations, he did not mention his involvement in, or the existence of, the partnership. The judgment creditors settled the cases for significantly less than the amounts of the judgments.

Defendants moved for summary judgment based on the doctrine of judicial estoppel, which protects the integrity of the judicial process by preventing a party from taking inconsistent positions in separate cases. The trial court granted the motion, reasoning that plaintiff's failure to mention the partnership at the judgment debtor exams barred his claim to a portion of the partnership's business. We conclude that, in accordance with the principles of judicial estoppel, the summary judgment must be reversed because the courts that ordered the exams did not adopt or accept the truth of plaintiff's testimony, eliminating any threat to judicial integrity.

Further, consistent with the equitable nature of judicial estoppel, the continued prosecution of this action serves the interests of plaintiff's judgment creditors, who may have been misled by his debtor exam testimony. The judgment creditors may be able to recover damages or rescind the settlements based on the statements plaintiff made as a judgment debtor.

# I

## BACKGROUND

The following allegations are taken from the pleadings and the facts from the evidence submitted on the summary judgment motion.

A. *The Complaint*

In 1979, plaintiff Shashikant Jogani (who prefers to be called Shashi on appeal) began investing in residential apartment properties in and around Los Angeles County. By 1989, he owned properties having a fair market value of $375 million and a net equity of $100 million. Years later, because of an economic recession that started in the late 1980's and continued into the mid-1990's, Shashi faced defaults and foreclosures on valuable properties.

In April 1995, Shashi entered into a general partnership (Partnership) pursuant to an oral agreement (Partnership Agreement) with his brothers, Haresh Jogani, Rajesh Jogani, Chetan Jogani, and Sailesh Jogani. Shashi transferred ownership of his properties to the Partnership. Thereafter, the properties were held nominally by several corporations created for that purpose, namely, J.K. Properties, Inc., H.K. Realty, Inc., Hansa Investments, Inc., Commonwealth Investment, Inc., Mooreport Holdings Limited, and Gilu Investments Limited (collectively Partnership Entities). Under the Partnership Agreement, the Partnership actually owned these corporations notwithstanding nominal ownership in the names of certain of Shashi's brothers and other relatives.

Shashi agreed to act exclusively as a consultant for the Partnership, managing its properties and acquiring additional properties for investment purposes. Shashi transferred three separate life insurance policies (worth $1 million each) to his brother Haresh as the nominal owner, transferred title to his residence to H.K. Realty, and transferred a securities account to Haresh and H.K. Realty.

For their part, Shashi's brothers agreed to provide the capital needed to acquire Shashi's properties and to fund his acquisition of additional properties for the Partnership. They also agreed to pay Shashi a monthly sum for his services as a consultant. He did not always receive the consulting fee.

Shashi's brothers were to receive all proceeds ("profits, sale, refinancing") until they recouped their investment plus a return of 12 percent. Once that occurred, Shashi was to receive one-half of all "profits, proceeds, and value" concerning the Partnership and its properties. In November 2001, after several years of work, Shashi became entitled to his 50 percent share. He was paid $2.4 million at that time.

In June 2002, the Partnership owned properties having a fair market value in excess of $1 billion and a net equity of around $550 million. Under the Partnership Agreement, Shashi was entitled to $225 million. Nevertheless, Haresh, acting on behalf of himself and the other brothers, refused to honor the Partnership Agreement, removed Shashi from management of the Partnership's properties, and recharacterized the $2.4 million payment as a loan, demanding it be repaid.

In February 2003, Shashi filed this action against his brothers, other relatives, and the Partnership Entities. Apparently, Haresh, one other relative, and the Partnership Entities (collectively defendants) were the only ones to make an appearance. A second amended complaint (complaint) was filed later in 2003, alleging causes of action for breach of contract, breach of fiduciary duty, fraud, conspiracy to commit fraud, dissolution of partnership, quantum meruit, unjust enrichment, and constructive trust. Each cause of action was premised on the existence of the Partnership and a breach of the Partnership Agreement. Shashi estimated his damages to be at least $250 million.

After filing an unsuccessful demurrer and motion to strike portions of the complaint, defendants filed an answer generally denying all allegations. (See Code Civ. Proc., § 431.30, subd. (d).) Haresh and certain of the Partnership Entities filed a cross-complaint against Shashi, alleging mismanagement. Shashi filed a general denial. (See *ibid.*)

## B. *Motion for Summary Judgment*

On June 8, 2004, defendants filed a summary judgment motion, contending that judicial estoppel barred this action, and, alternatively, the oral partnership agreement was unenforceable because it was intended to defraud creditors. Shashi filed opposition papers. We accept as true the following facts and reasonable inferences supported by Shashi's evidence and defendants' undisputed evidence. (See *Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1125 [35 Cal.Rptr.3d 397].)

By the mid-1990's, the equity in Shashi's real estate holdings had fallen from $100 million to a negative $50 to $70 million. There were several lawsuits against him, brought by tenants, creditors, employees, and an insurance company. By 1998, many creditors had obtained judgments against him.

At his deposition in this case, taken in April and May 2004, Shashi testified he became a general partner in the Partnership when it was formed in April 1995, as did his brothers. Since April 1995, Shashi continuously has been a part owner of the Partnership, which owns the real estate acquired from him as well as the properties subsequently purchased as a result of his consulting work. The real estate was nominally held by the Partnership Entities, such as J.K. Properties and H.K. Realty. Since April 1995, Shashi has also continuously been a part owner of the Partnership Entities. Haresh supervised the operations of the Partnership and the Partnership Entities on behalf of the other brothers. If Haresh had tried to sell J.K. Properties at any point, Shashi would have filed suit based on his 50 percent ownership interest in the Partnership, which owned J.K. Properties.

In May 1997, the plaintiff in *Cappucci v. Jogani* (Super. Ct. L.A. County, 1996, No. BC143725) (*Cappucci*) secured a judgment against Shashi of around $639,000. The plaintiff questioned Shashi at a judgment debtor examination held on February 23, 1998, and March 9, 1998, at the county courthouse.

At the judgment debtor exam, Shashi was asked to identify "any entity in which you've ever owned any interest." He did not mention the Partnership or the Partnership Entities. He specifically stated he did not have "any interest" in J.K. Properties or H.K. Realty. Shashi testified that none of his family members owned any real property with him, nor did they own any real property with an entity in which he held an interest. When asked if he was presently a party to "any kind" of contract or agreement, he answered, "No." Shashi was also asked, "Are you involved in any joint ventures." He replied, "I wish, no." He later testified in this case that he believed "joint venture" is "the same as partnership."

After the judgment debtor exam, the plaintiff in *Cappucci* did not attempt to reach any interests Shashi had in the Partnership or the Partnership Entities, and she settled for $50,000. More specifically, one of the Partnership Entities purchased the $639,000 judgment for that sum.

In or about 1996, the plaintiff in *Weyerhauser Financial Investments v. Jogani* (Super. Ct. L.A. County, 1996, No. BC143926) (*Weyerhauser*) obtained a judgment against Shashi for about $644,000. In connection with *Weyerhauser*, Shashi was questioned at a judgment debtor examination conducted on March 23, 1998, and April 13, 1998, at the county courthouse.

At the exam, Shashi was asked if he was "currently a partner in any partnership." He said he was a 1 percent limited partner in four or five limited partnerships. He identified each by name. He did not mention the Partnership. Shashi testified that Haresh was the owner or a part owner of J.K. Properties and H.K. Realty. When asked, "[D]o you have any interest . . . in any companies that are owned directly or indirectly by Haresh Jogani," Shashi replied, "Absolutely not. Absolutely not." In response to the question, "Do you have any interest in re-acquiring any of the properties that were purchased by any company that Mr. Haresh Jogani controls," Shashi said, "No."

After the exam, the plaintiff in *Weyerhauser* did not make any effort to reach Partnership-related assets and accepted $50,000 for the $644,000 judgment. Haresh sent the settlement money to Shashi's attorney and charged it to the Partnership.

The plaintiffs in *Cappucci* and *Weyerhauser* were not alone. A plaintiff in a third action obtained multiple judgments against Shashi totaling around $696,000 and settled for $50,000. In a fourth case, the plaintiff recovered a judgment of $878,000 and accepted $62,000.

At the judgment debtor exams in *Cappucci* and *Weyerhauser*, Shashi believed that the questions were addressed to what he owned as of that time—in his words, "something" the judgment creditors could "put [their] hands on." He did not believe the questions covered a future or contingent interest, in part because he thought it had no present value. Shashi did not think he had an ownership interest in the Partnership in 1998 because he was not entitled to his 50 percent share until his brothers had recouped their investment plus a 12 percent return—which did not happen until three years later. Shashi had been advised by counsel before the debtor exams that his interest in the Partnership had not "vested," so "you don't have a present ownership of anything." But the attorney also said Shashi was presently a partner in the Partnership and a party to the Partnership Agreement. Shashi had some

control over when his Partnership interest vested because he alone controlled the Partnership's investment strategy.

As Shashi testified at his deposition, the "contingent" nature of his interest in the Partnership allowed his brothers to obtain loans for which he could not qualify. Based on past experience, certain financial institutions did not want to loan money to a company in which Shashi owned an interest. Haresh was able to obtain loans through the Partnership Entities and related companies because Shashi did not have a "present" ownership interest in the borrowing entity; he was only a consultant.

According to Shashi's personal attorney, in 1995, Haresh wanted to continue Shashi's real estate business and to have Shashi control it but "didn't want the appearance of Shashi having an interest that creditors could attack." Haresh was actively involved in creating and structuring the Partnership and the Partnership Entities. Haresh also approved of "everything that was done regarding satisfaction of judgments and buying judgments." Shashi and Haresh believed that if a lender knew about the existence of the Partnership, the Partnership Entities might have difficulty obtaining loans.

On August 24, 2004, the trial court heard argument on the summary judgment motion and took it under submission. In a written ruling dated September 22, 2004, the trial court granted the motion, explaining that judicial estoppel applied to Shashi's testimony in the judgment debtor examinations and that the testimony was inconsistent with the basis of this lawsuit.[1] Shashi moved for reconsideration and for leave to amend the complaint, both of which were denied. The cross-complaint was voluntarily dismissed. Judgment was entered in favor of defendants. Shashi appealed.

## II

## DISCUSSION

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" ' "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or

---

[1] The trial court did not rule on defendants' alternative argument that the oral partnership agreement was unenforceable. Because defendants do not contend on appeal that the judgment should be affirmed on that ground, we do not discuss it.

more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed." ' " (*Huntington Memorial Hospital v. Superior Court* (2005) 131 Cal.App.4th 893, 901 [32 Cal.Rptr.3d 373].)

■ " 'Judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, prevents a party from "asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. . . ." ' . . . It is an ' "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." ' " (*Daar & Newman v. VRL International* (2005) 129 Cal.App.4th 482, 490–491 [28 Cal.Rptr.3d 566].)

In California, courts consider five factors in determining whether to apply judicial estoppel: "The doctrine [most appropriately] applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986–987 [12 Cal.Rptr.3d 287, 88 P.3d 24] (*Aguilar*), quoting *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183 [70 Cal.Rptr.2d 96] (*Jackson*); accord, *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422 [30 Cal.Rptr.3d 755, 115 P.3d 41] (*MW Erectors*).)

"[C]ourts have uniformly recognized that [the] purpose [of judicial estoppel] is 'to protect the integrity of the judicial process.' " (*New Hampshire v. Maine* (2001) 532 U.S. 742, 749 [149 L.Ed.2d 968, 121 S.Ct. 1808, 1814] (*New Hampshire*); accord, *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 826–827 [39 Cal.Rptr.3d 189].) The doctrine is " 'aimed at preventing fraud on the courts.' . . . [It] ' " 'is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process . . . . "The policies underlying preclusion of inconsistent positions are 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings.' " . . . Judicial estoppel is "intended to protect against a litigant playing 'fast and loose with the courts.' " ' " . . . "It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the

opposite." ' " (*M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456, 463 [3 Cal.Rptr.3d 563].)

■ Judicial estoppel also " ' "protect[s] parties from opponents' unfair strategies" ' " (*Aguilar, supra,* 32 Cal.4th at p. 986) and "targets . . . unfairness between individual parties" (*MW Erectors, supra,* 36 Cal.4th at p. 424). Even so, the doctrine is primarily concerned with the connection between a party and the judicial system, not the relationship between the parties. (See *International Engine Parts, Inc. v. Feddersen & Co.* (1998) 64 Cal.App.4th 345, 350–351 [75 Cal.Rptr.2d 178] (*International Engine Parts*); *Jackson, supra,* 60 Cal.App.4th at p. 183; *Montrose Medical Group v. Bulger* (3d Cir. 2001) 243 F.3d 773, 779 & fn. 3.)

Thus, a litigant seeking to invoke judicial estoppel typically is not required to make a showing of privity or detrimental reliance. (See *Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 1015–1016 [79 Cal.Rptr.2d 544]; *Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 151 [53 Cal.Rptr.2d 336], overruled on another point in *Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 92–94 [111 Cal.Rptr.2d 711]; *Jethroe v. Omnova Solutions, Inc.* (5th Cir. 2005) 412 F.3d 598, 600.) "[N]umerous courts have concluded . . . that '[w]hile privity and/or detrimental reliance are often present in judicial estoppel cases, they are not required.' " (*Burnes v. Pemco Aeroplex, Inc.* (11th Cir. 2002) 291 F.3d 1282, 1286.) As we have stated: " 'The gravamen of judicial estoppel is not privity, reliance, or prejudice. Rather, it is the intentional assertion of an inconsistent position that perverts the judicial machinery.' " (*Jackson, supra,* 60 Cal.App.4th at p. 183; see *id.* at pp. 182–183 [contrasting judicial estoppel with collateral estoppel and equitable estoppel].)

We do not suggest that there are "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." (*New Hampshire, supra,* 532 U.S. at p. 751; see *ibid.* [judicial estoppel may be more appropriate in cases involving "unfair detriment"].) Further, given that "judicial estoppel is an equitable doctrine, . . . its application, even where all necessary elements are present, is discretionary." (*MW Erectors, supra,* 36 Cal.4th at p. 422, italics omitted.) The doctrine should be applied with caution and limited to egregious circumstances. (See *Haley v. Dow Lewis Motors, Inc.* (1999) 72 Cal.App.4th 497, 511 [85 Cal.Rptr.2d 352]; *California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 118 [113 Cal.Rptr.2d 915].)

■ The factor of success—whether the court in the earlier litigation adopted or accepted the prior position as true—is of particular importance.

The United States Supreme Court has recognized that, in deciding whether to apply judicial estoppel, "courts regularly inquire whether the party [to be estopped] has *succeeded* in persuading a court to *accept* that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was *misled.*' . . . Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court *determinations,*' . . . and thus poses little threat to judicial integrity." (*New Hampshire, supra,* 532 U.S. at pp. 750–751, citations omitted, italics added.) We, too, have made this point. (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832 [30 Cal.Rptr.3d 588]; see also *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1246 [132 Cal.Rptr.2d 57].)

Recently, the high court held that judicial estoppel did not apply where the party to be estopped had not successfully asserted his prior position, notwithstanding that the other judicial estoppel factors, considered separately, might have supported the doctrine's application. (*Zedner v. United States* (2006) 547 U.S. \_\_\_, \_\_\_ [164 L.Ed.2d 749, 126 S.Ct. 1976, 1987–1988] (*Zedner*).) The court concluded that the other factors did not "predominate" in light of the circumstances. (*Id.* at p. \_\_\_ [126 S.Ct. at p. 1988].)

"[I]f a party's initial position was never accepted by a court or agency, then it is difficult to see how a later change manifests an 'intent to play fast and loose with the court[s].' . . . We think this insight explains why the consensus view among [the federal] circuits is that judicial estoppel is inappropriate unless the earlier position was accepted by a court or agency." (*Montrose Medical Group, supra,* 243 F.3d at p. 782, italics omitted; see *id.* at p. 782 & fn. 6 [citing cases from eight circuits]; accord, 18 Moore's Federal Practice (3d ed. 2006) § 134.33[4], p. 134-77 & fn. 10 [citing cases from first seven circuits]; *Stallings v. Hussmann Corp.* (8th Cir. 2006) 447 F.3d 1041, 1047–1049; *Hamilton v. State Farm Fire & Cas. Co.* (9th Cir. 2001) 270 F.3d 778, 783; *Johnson v. Lindon City Corp.* (10th Cir. 2005) 405 F.3d 1065, 1069; *Water Technologies Corp. v. Calco, Ltd.* (Fed. Cir. 1988) 850 F.2d 660, 665–666; see also *Konstantinidis v. Chen* (1980) 200 U.S. App.D.C. 69 [626 F.2d 933, 936, fn. 6, 938–939]; *Smith v. District of Columbia* (D.D.C. 2003) 295 F.Supp.2d 53, 55–56.)

Here, the same party—Shashi—has taken totally inconsistent positions in separate judicial proceedings. In the *1998* judgment debtor examinations, he testified to the effect that, as of that time, he was not a partner in the Partnership, did not have or own "any interest" in the Partnership Entities, did not own any real property with family members, and was not a party to any kind of agreement. At his 2004 deposition in this case, Shashi testified in

essence that *since 1995*, he continuously has been a general partner in the Partnership, has had an ownership interest in the Partnership Entities, has been a part owner—with his brothers—of the Partnership's real properties, and has been a party to the Partnership Agreement. And, according to the deposition, if Haresh had tried to sell one of the Partnership Entities at any time *after 1995*, Shashi would have filed suit based on his interest in that entity.

Nor were these inconsistencies the result of ignorance or mistake on Shashi's part. (See *Aguilar, supra*, 32 Cal.4th at pp. 986–987.) At the 1998 debtor exams, when Shashi's assets were at stake, he denied any and all interests, including membership and ownership, in the Partnership, the Partnership Entities, and the entities' real estate holdings. In 2004, when he stood to gain $250 million, Shashi testified in deposition that his interests, membership, and ownership dated back to 1995, three years before the debtor exams.

Shashi attempts to explain the changes in his testimony based on the advice of counsel. Before the judgment debtor exams, an attorney advised him that his ownership interest in the Partnership had not yet vested because his brothers had not recouped their investment. But the attorney also said Shashi was presently a partner in the Partnership and was a party to the Partnership Agreement. Yet, at the debtor exams, Shashi testified to the effect that he was *not* a partner in the Partnership or a party to any agreement. And the attorney's advice does not explain why Shashi testified in this action that his interests in the Partnership and its assets have existed *continuously since 1995*. We therefore conclude that the inconsistencies were deliberate.[2]

Nevertheless, as we now discuss, the judicial estoppel factor of success is not satisfied on the record here: The courts in Shashi's judgment debtor proceedings did not adopt or accept his testimony as true.

## A. *The Factor of Success*

Judgment debtor examinations serve an important function in our judicial system. They are intended to "leave no stone unturned in the search for assets which might be used to satisfy the judgment." (*Troy v. Superior Court* (1986) 186 Cal.App.3d 1006, 1014 [231 Cal.Rptr. 108].) The examination process is governed largely by statute. (Code Civ. Proc.,

---

[2] Given that the attorney's advice does not reconcile the inconsistencies in Shashi's testimony, we do not decide whether advice of counsel may give rise to the type of ignorance or mistake that precludes the application of judicial estoppel. (Compare *Haley v. Dow Lewis Motors, Inc., supra*, 72 Cal.App.4th at p. 511 [intent to play fast and loose with the courts is absent where inconsistency is based on legal advice] with *Thomas v. Gordon* (2000) 85 Cal.App.4th 113, 118–119 [102 Cal.Rptr.2d 28] (*Thomas*) [judicial estoppel applies despite reliance on "advice of professionals"].)

§§ 708.110–708.205.) Upon application by a judgment creditor, the superior court issues an order directing the judgment debtor to appear before the court or a court-appointed referee and provide information to aid in the enforcement of a money judgment. (*Id.*, §§ 708.110, 708.140.) Service of the order creates a lien on the nonexempt personal property of the debtor for one year from the date of the order. (*Id.*, § 708.110, subd. (d).) Failure to appear at the examination may result in arrest. (*Id.*, § 708.170, subd. (a)(1).) The debtor has the right to claim that property is statutorily exempt from enforcement. (See *id.*, §§ 703.010–703.030.)

■ The court or referee may conduct the actual examination. (Code Civ. Proc., §§ 708.110, subd.(a), 708.140, subd. (a).) In most cases, however, the court simply administers an oath to the examinee, explains the nature of the proceeding, sends the parties out of the courtroom, and permits the judgment creditor's attorney to conduct the exam; the parties may return to the courtroom if a dispute arises about the appropriateness of a question or answer. (See Cal. Judges Benchbook: Civil Proceedings After Trial (CJER 1998) Supplemental Enforcement Proceedings, § 7.26, p. 413; 2 Debt Collection Practice in Cal. (Cont.Ed.Bar 2d ed. 2005) §§ 8.31, 8.35–8.36, 8.42, pp. 556–557, 559–569, 577–578; Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2006) ¶ 6:1312, pp. 6G-11 to 6G-12 (rev. # 1, 2001).)

"[D]ebtor examinations often occur informally, in the hallway outside the courtroom or in an adjacent room." (*Nebel v. Sulak* (1999) 73 Cal.App.4th 1363, 1369 [87 Cal.Rptr.2d 385].) Most courts do not provide court reporters for debtor exams, and the judgment creditor may find it advisable to hire one. (See 2 Debt Collection Practice in Cal., *supra*, § 8.34, p. 559; Ahart, Cal. Practice Guide: Enforcing Judgments and Debts, *supra*, ¶ 6:1312, p. 6G-12 (rev. # 1, 2001).) The debtor is generally entitled to assert the same privileges that would be available at trial in refusing to answer questions. (*Hooser v. Superior Court* (2000) 84 Cal.App.4th 997, 1002–1003 [101 Cal.Rptr.2d 341].) The proceeding is open to the public. (*Nebel v. Sulak, supra*, 73 Cal.App.4th at pp. 1368–1369.)

■ At the conclusion of judgment debtor proceedings, the court or referee may issue a "turnover order," instructing the debtor to deliver nonexempt property or funds to a levying officer, the judgment creditor, or a receiver, who may proceed with ·sale or collection after obtaining any necessary assignments. (Code Civ. Proc., § 708.205, subd. (a); Cal. Law Revision Com. com., 17 West's Ann. Code Civ. Proc. (1987 ed.) foll. § 708.205, p. 455.) A turnover order is enforceable by contempt and creates a lien on the property. (*Ibid.*) If the judgment debtor makes a claim of exemption, the court, not a referee, must determine the claim. (Code Civ.

Proc., § 708.140, subd. (a)(3); *Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 547–548 [39 Cal.Rptr.2d 432].) This statutory framework, authorizing judgment debtor proceedings and turnover orders, is an alternative to enforcing a judgment by way of levy under a writ of execution. (*Imperial Bank, supra,* at pp. 549–550.)

Here, we have only a *partial* reporter's transcript of Shashi's judgment debtor examinations. Defendants do not contend that a judge or referee considered or resolved any objection, dispute, or claim in connection with the exams. The transcripts do not show that a judge or referee said anything or that anything was said to a judge or referee. The exams were conducted by counsel for the judgment creditors. No orders were issued. Defendants do not assert that a transcript of the testimony was lodged or filed with the courts that ordered the exams.[3]

Because the courts in the judgment debtor proceedings did not consider the substance of Shashi's testimony, much less adopt it or accept it as true, his allegations and deposition testimony in this action "introduce[] no 'risk of inconsistent court *determinations,*' . . . and thus pose[] little threat to judicial integrity." (*New Hampshire, supra,* 532 U.S. at p. 751, italics added.) The outcome in this action cannot possibly create " 'the perception that either the first or the second court was misled' " (*id.* at p. 750), given that the first courts did not rely on the testimony at all. Any inconsistencies can be resolved initially in this action. And in *Jackson, supra,* 60 Cal.App.4th 171, on which defendants heavily rely, we expressly left open the question of whether judicial estoppel could be based on testimony from a prior proceeding. (*Id.* at pp. 185–186 & fn. 9, discussing *Cheatwood v. Roanoke Industries* (N.D.Ala. 1995) 891 F.Supp. 1528.)

Defendants' argument on appeal is reduced to this: Judicial estoppel should bar an action where, in earlier litigation, the plaintiff made inconsistent sworn statements even though they were never considered by the court in that litigation. But under the rules of evidence, prior inconsistent statements, sworn or otherwise, may be admitted in a subsequent action, and any conflicts in the evidence will be resolved by the trier of fact.

Under the Evidence Code, specifically section 1235, prior inconsistent statements of witnesses may be used at trial to prove the truth of the matter asserted and to impeach the witness's credibility. (See *Clifton v. Ulis* (1976) 17 Cal.3d 99, 103–104 [130 Cal.Rptr. 155, 549 P.2d 1251].) As explained by the California

---

[3] On the first day of testimony in the *Weyerhauser* exam, counsel for the respective parties made *initial* appearances before a commissioner. Counsel for *Weyerhauser* conducted the exam. If the commissioner was present during the questioning—which appears unlikely given the exchanges between counsel—he remained silent.

Law Revision Commission: "[The Evidence Code] admits inconsistent statements of witnesses because the dangers against which the hearsay rule is designed to protect are largely nonexistent. The declarant is in court and may be examined and cross-examined in regard to his statements and their subject matter. . . . The trier of fact has the declarant before it and can observe his demeanor and the nature of his testimony as he denies or tries to explain away the inconsistency. Hence, it is in as good a position to determine the truth or falsity of the prior statement as it is to determine the truth or falsity of the inconsistent testimony given in court." (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1235, p. 225.)

Similarly, testimony or sworn statements of a party from an earlier action may constitute admissions under Evidence Code section 1220 and may be admitted as substantive evidence and for impeachment. In criminal and civil proceedings, testimony of a party at a prior civil trial is admissible as an admission. (*People v. Epperson* (1985) 168 Cal.App.3d 856, 859 [214 Cal.Rptr. 540]; *Gates v. Pendleton* (1925) 71 Cal.App. 752, 755–757 [236 P. 365].) A party's affidavits are also admissible in a subsequent action. (*Shafter v. Richards* (1859) 14 Cal. 125, 125–126.) And "[w]hile a verified pleading filed by a party in one action is competent evidence against him in another case as an admission, it is not conclusive and does not carry the effect of an estoppel of record." (*Oceanview Memorial Park v. Caminetti* (1943) 59 Cal.App.2d 703, 711 [139 P.2d 674].)

Under defendants' view, the mere existence of prior inconsistent statements, without more, is sufficient to apply judicial estoppel: The first court need not consider the truthfulness of the statements, and the second court should bar the action without deciding the prior statements' veracity. But the courts' general function is to seek the truth: The trier of fact weighs the evidence, makes credibility determinations, and evaluates conflicting evidence in arriving at a just verdict or result.

As stated by the Sixth Circuit: "Judicial estoppel is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement. For example, before the doctrine of judicial estoppel may be invoked, the prior argument must have been accepted by the court. . . . Although this limit allows parties to contradict themselves in court, it threatens only the *integrity of the parties*, not of the *court*. . . . [W]e rely on *impeachment during cross-examination* to deter parties from contradicting their *prior statements to the court*. . . . Requiring *prior judicial acceptance* protects the truth-seeking function of the court, while preserving the court's integrity." (*Teledyne Industries, Inc. v. N.L.R.B.* (6th Cir. 1990) 911 F.2d 1214, 1218, citations and fn. omitted, italics added.)

We agree with defendants that a judgment debtor examination is not the equivalent of a deposition. A debtor exam is typically held at the courthouse pursuant to a court order. The public may attend. A judge or referee puts the examinee under oath and may conduct the exam. The proceeding focuses on finding assets to satisfy the judgment. In contrast, the deposition of a party usually takes place at an attorney's office pursuant to a notice from the attorney. It is not open to the public. A certified shorthand reporter puts the deponent under oath. Attorneys ask the questions. The goal is to obtain evidence concerning potential liability and damages.

Of course, there are judgment debtor proceedings, like the ones involved here, where attorneys conduct the examinations and where neither the court nor a referee evaluates the testimony. There are also depositions where the court gets involved by, for example, issuing a protective order, ruling on objections, or appointing a referee to supervise the taking of testimony. (See Code Civ. Proc., §§ 2025.420, 2025.480, 639, subd. (a)(5); Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶¶ 8:742 to 8:744, p. 8E-122 (rev. # 1, 2006).)

■ Nevertheless, it does not follow that, as defendants argue, judicial estoppel cases involving deposition testimony are irrelevant. As one federal court explained with respect to statements made at a deposition in a *prior* action: " 'The doctrine of judicial estoppel forbids a party "from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." ' . . . The doctrine does not necessarily prevent a party from making statements that are arguably inconsistent with *prior statements made under oath* . . . . Rather, the doctrine is properly invoked where the invoking party can show that the opposing party 'took a contrary position under oath in a prior proceeding *and* that the prior position *was accepted by the court.*' . . . [¶] . . . [¶]

"[D]eposition testimony in general is not relevant, in and of itself, to a judicial estoppel analysis. Prior inconsistent statements given during a deposition are admissible at trial for several purposes. If made by a non-party witness, . . . they are admissible both for the purpose of impeachment and as substantive evidence. . . . *See* Fed.R.Evid. 613 & 801(d)(1)(A). If made by a party, . . . the same is true if he were to take the witness stand, and it is possible that the statements could also come in as admissions by a party-opponent. *See id.* Rule 801(d)(2). Regardless, application of the judicial estoppel doctrine requires something more than the mere existence of prior inconsistent statements made under oath.

"Before the Court can determine that [the plaintiff] is judicially estopped from pursuing his allegations in this case, the Defendants must show not only

that arguably inconsistent statements were made, but that they were integral to the factual *position* which [the plaintiff] maintained in his other litigation, *and* that this position was *accepted* by the other courts in rendering their respective decisions." (*Nilavar v. Mercy Health System-Western Ohio* (S.D.Ohio 2003) 254 F.Supp.2d 897, 901–902 (*Nilavar*).)

The court continued: "The Defendants would have this Court recognize a . . . rule . . . that a party who has said one thing in his deposition taken in relation to one case cannot contradict himself in a subsequent case. The problem with this proposition is that the Federal Rules of Evidence already speak to the situation. As noted above, the Rules of Evidence already address how prior sworn statements are to be treated as a matter of evidence. Adopting the Defendants' proposed rule would require the Court to take the extraordinary step of transforming factual questions traditionally left for the ultimate trier of fact, including questions concerning a party's or witness' honesty and veracity, into legal questions for the Court to decide prior to trial. That would be improper." (*Nilavar, supra*, 254 F.Supp.2d at p. 903.)

Defendants point out that, in opposing a summary judgment motion, a plaintiff may not create a disputed issue of fact by contradicting his or her deposition testimony with an affidavit or declaration. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20–22 [112 Cal.Rptr. 786, 520 P.2d 10] (*D'Amico*); Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶¶ 10:155 to 10:156.21, pp. 10-57 to 10-60 (rev. # 1, 2006).) In other words, the plaintiff is bound by the deposition. But *D'Amico* does not determine the application of judicial estoppel.

"[The *D'Amico* rule] might be described as pre-trial estoppel. Though the context in which it is utilized is different, it serves the same function as judicial estoppel: it operates to prevent a party from playing 'fast and loose' with the courts by creating 'sham' issues of fact. . . .

"These distinct rules should not be conflated. Though they serve the common aim of maintaining the integrity of the judicial process, they operate in distinct contexts . . . . The rule of pre-trial estoppel says that a party cannot say one thing at a deposition only to reverse course when his deposition is used against him in a motion for summary judgment in the same litigation. The doctrine of judicial estoppel operates in a broader context, and says that a party cannot, in front of one court, maintain one factual position, . . . and then maintain a contradictory factual position in front of another court. . . .

". . . A court should only preempt the fact-finding process, and state as a matter of law that a party's factual position at a given time is impermissible, when it is obvious on the face of things that a party is abusing civil procedure for the purpose of preventing the court from rendering an

adverse ruling. . . . Thus, when a party opposing a motion for summary judgment asserts a fact that contradicts an earlier statement given at his deposition, . . . it is proper for the trial court to disregard the recently fabricated assertion. By the same token, where the transcript of an earlier trial . . . exists and it is apparent what position a party took therein, and it is also apparent that the court in charge of that proceeding *accepted and relied upon the party's position*, then it is proper for the court in the present proceeding not to allow the same party to maintain a factually contradictory position in the case before it. Neither of those two rules speaks to how a court should treat evidentiary materials that were created as part of earlier litigation but *did not become part of the record therein* . . . . Because, in such a case, *only the opposing party* stands the potential to be misled by newly concocted testimony, *not the court*, any sworn, prior inconsistent statements that do exist are properly raised *on cross-examination at trial* . . . ." (*Nilavar, supra*, 254 F.Supp.2d at pp. 903–904, italics added.)

Defendants' position is not entirely without support. In *Hamilton v. Zimmerman* (1857) 37 Tenn. (5 Sneed) 39 (*Hamilton*), the Tennessee Supreme Court decided what is widely regarded as the first judicial estoppel case in the country. There, the plaintiff, a pharmacist, was a part owner of a pharmacy on the verge of financial ruin. The defendant bought the pharmacy, and the plaintiff continued to work there. After the defendant sold the business, the plaintiff filed suit for a share of the profits, alleging the parties had formed a secret oral partnership that entitled him to one-half of the proceeds. The defendant denied the existence of the partnership, contending the plaintiff was employed as a clerk. In support of his defense, the defendant relied on sworn pleadings in earlier litigation between the parties in which the plaintiff had admitted he was a clerk. (*Id.* at pp. 46–47.)

The court held that the plaintiff was estopped to pursue his partnership claim, explaining: "[The plaintiff's prior pleading] is at least an implied admission of the truth of the statement of [the defendant]—that [the plaintiff] was merely his clerk. And for all the purposes of the present [complaint], the admission must be taken as true, without inquiring whether, as a matter of fact, it be so or not. The law, as against the [plaintiff], presumes that it is true; and this presumption proceeds upon the doctrine of estoppel, which, from motives of public policy or expediency, will not, in some instances, suffer a man to contradict or gainsay, what, under particular circumstances, he may have previously said or done. This doctrine is said to have its foundation in the obligation under which every man is placed to speak and act, according to the truth of the case; and in the policy of the law to suppress the mischiefs from the destruction of all confidence in the intercourse and dealings of men, if they were allowed to deny that, which by their *solemn and deliberate acts, they have declared to be true*. And this doctrine applies with peculiar force, to admissions or statements made under *the sanction of an oath*, in the course of

judicial proceedings. The chief security and safeguard for the purity and efficiency of the administration of justice, is to be found in the proper reverence for *the sanctity of an oath.*" (*Hamilton, supra,* 37 Tenn. at pp. 47–48, italics added.)

*Hamilton*'s approach to judicial estoppel, sometimes called the "absolute" rule, has not enjoyed broad acceptance. It applies primarily in Tennessee. (See Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel* (1986) 80 Nw. U. L.Rev. 1244, 1250–1251 (hereafter *Precluding Inconsistent Statements*).) "[While] the Tennessee courts continue to apply this [strict] version of the doctrine, most modern authorities agree that the purpose of judicial estoppel is to ' "protect the integrity of the judicial process," ' . . . not just the sanctity of the oath, and that 'a hallmark of the doctrine is its flexible application.' " (*Whitacre P'ship v. Biosignia, Inc.* (2004) 358 N.C. 1, 13–14 [591 S.E.2d 870, 879].)

By focusing narrowly on the oath, the absolute rule is overly harsh. "As originally conceived in *Hamilton v. Zimmerman,* the doctrine of judicial estoppel was based solely on the sanctity of the oath. . . . Under this philosophy, the fact a litigant is using the court as a forum for his inconsistent statements injures the judicial system; therefore, such abuse must be avoided under all circumstances. . . . Any perpetuation of untruth or misrepresentation eviscerates public confidence in the integrity of the judicial system. . . . Accordingly, *whether a party was successful or not in propounding the validity of its initial position is immaterial*: the party will be judicially estopped from assuming a different stance, relating to the facts, in subsequent proceedings." (*Quinn v. Sharon Corp.* (2000) 343 S.C. 411, 422 [540 S.E.2d 474, 480], citations omitted, italics added.)

In rejecting the absolute rule, the Michigan Supreme Court stated: "In *Hamilton*, the court determined that the plaintiff was estopped from maintaining a position inconsistent with one he had asserted under oath in an earlier judicial proceeding. Sometimes described as the doctrine against the assertion of inconsistent positions, . . . judicial estoppel is widely viewed as a tool to be used by the courts in impeding those litigants who would otherwise play 'fast and loose' with the legal system. . . .

"In the context of the . . . proceedings at issue, we adopt the 'prior success' model of judicial estoppel: 'Under this doctrine, a party who has *successfully* and unequivocally asserted a position in a prior proceeding is estopped from asserting an inconsistent position in a subsequent proceeding.' . . . [¶] Under the 'prior success' model, the mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication that the court in the earlier proceeding accepted that party's position as true."

(*Paschke v. Retool Industries* (1994) 445 Mich. 502, 509–510 [519 N.W.2d 441, 444], citations omitted, italics added in *Paschke*.) "In contrast to the *Hamilton* test, the 'prior success' model is more narrowly tailored to allow for alternative pleadings in the same or different proceedings. As such, it may be seen as focusing less on the danger of inconsistent *claims*, than on the danger of inconsistent *rulings*." (*Id.* at p. 510, fn. 4 [519 N.W.2d at p. 444, fn. 4], italics added.)

The Second Circuit is in accord. "A court could, of course, uphold the sanctity of the oath by applying estoppel to prohibit a litigant from asserting under oath inconsistent positions in two proceedings even when there is no risk of an inconsistent outcome. Indeed, in the case that first announced the doctrine of judicial estoppel there was no threat of a result inconsistent with an earlier proceeding; instead, the court based its reasoning entirely on its desire to preserve the sanctity of the oath. *Hamilton v. Zimmerman*, 37 Tenn. (5 Sneed) 39 (1857). [¶] . . . [¶]

"But this court . . . [has] decided that estoppel only applies when a tribunal in a prior proceeding has accepted the claim at issue by rendering a favorable decision. . . . By adopting a rule that requires acceptance by the earlier tribunal of the litigant's statements, this court limits the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." (*Simon v. Safelite Glass Corp.* (2d Cir. 1997) 128 F.3d 68, 71–72, citations omitted.)

As one commentator has noted: "The absolute rule is so broad and far-reaching . . . that in many cases the equities do not clearly favor its application. . . . When balancing what the judicial system gains—integrity—with what it loses—forfeiture by the parties of their legal rights [and] judicial abdication of the truthseeking function—it is questionable whether the equities support such a broad form of judicial estoppel." (*Precluding Inconsistent Statements*, *supra*, 80 Nw. U. L.Rev. at p. 1255.) "[G]iven the 'extreme' nature of judicial estoppel and the 'harsh' results of its application, it is perhaps better to choose the more limited prior success rule. . . . Because a party's right to assert a position and the judicial truthseeking function are at stake, this doctrine 'is one to be applied with caution.' The prior success rule proceeds with the caution that the absolute rule lacks, and thus is a more rational and controlled response to the threat to judicial integrity posed by inconsistent positions." (*Id.* at p. 1258, fns. omitted.)

We therefore decline to apply *Hamilton*'s absolute rule and adhere to the judicial estoppel factors—including successful assertion of the prior position—established by our Supreme Courts. (See *New Hampshire*, *supra*, 532 U.S. at p. 751; *MW Erectors*, *supra*, 36 Cal.4th at p. 422.) Further, in

*Hamilton*, the prior sworn statement (a verified pleading) was *filed* in the earlier litigation, creating a risk that the first court might be misled by it. In the present case, the prior testimony was not offered in the judgment debtor proceedings for any type of consideration by the courts. And, as stated, the courts that ordered the debtor examinations did not adopt or accept Shashi's testimony as true. In short, Shashi did not successfully assert his prior position.[4]

We acknowledge that the success factor may not *always* have to be satisfied. (See, e.g., *Thomas, supra*, 85 Cal.App.4th at pp. 118–119 [prior bankruptcy proceeding]; *Drain v. Betz Laboratories, Inc.* (1999) 69 Cal.App.4th 950, 957–958 [81 Cal.Rptr.2d 864] [prior workers' compensation proceeding]; *Jackson, supra*, 60 Cal.App.4th at p. 183, fn. 8 [dicta].) "Full, truthful disclosures in judicial or administrative proceedings are important in and of themselves. Regardless of whether the motive was pure or the effects of the falsehood inconsequential, we must expect honesty and frankness in all judicial and administrative proceedings from parties that choose to bring lawsuits in our courts." (*International Engine Parts, supra*, 64 Cal.App.4th at p. 354.) But each case must be decided on its own facts and in light of equitable considerations.

For example, in *Thomas, supra*, 85 Cal.App.4th 113, the plaintiff, a physician, established two corporations that would be funded almost entirely by her medical practice and managed by her paramour. The plaintiff was not an officer, director, or shareholder of either corporation. The admitted purpose of this arrangement was to shelter plaintiff's income from creditors. The plaintiff had retained the defendant, an accountant, to advise her with respect to the creation and operation of the corporations. Later, the plaintiff filed two bankruptcy petitions in which her schedules and statements of financial affairs did not mention any type of interest in the corporations. She amended the schedules once but again failed to list any such interest. Her bankruptcy petitions were ultimately dismissed.

After the corporations ceased doing business, the plaintiff sued the accountant, alleging he had not properly advised her about corporate matters. The accountant moved for summary judgment on the ground of judicial estoppel. The trial court granted the motion. The Court of Appeal affirmed, stating the plaintiff's bankruptcy papers indicated she had no interest in either corporation. Thus, the accountant owed her no duty of care. (*Thomas, supra*, 85 Cal.App.4th at pp. 120–121.)

The *Thomas* court also addressed the factor of success, explaining: "[T]here is no hard and fast rule which limits application of the doctrine to those situations where the litigant was successful in asserting the contradic-

---

[4] We do not decide whether the settlements in *Cappucci* or *Weyerhauser* constitute prior success because the parties have not raised that issue on appeal.

tory position. . . . [¶] We believe that this is a situation which warrants application of the doctrine of judicial estoppel even absent proof of success in the earlier litigation. [The plaintiff] brazenly admits that she transferred her most valuable asset—her income stream—to a corporation owned wholly by her paramour in order to keep it out of the hands of her creditors. She then filed for bankruptcy, clearly expecting to reclaim her funds from her trusted friend after all of her lawful debts were discharged. Not once, but three times, she signed documents under oath for filing with the bankruptcy court which claimed to list all of her assets but said nothing about any interest in [the corporations] or the funds she allegedly believed were being held for her there. Assuming that the doctrine of judicial estoppel should be applied to an *unsuccessful* litigant only in the *rare situation* where the litigant has made an *egregious* attempt to manipulate the legal system, we agree with the trial court that '*this is as egregious as it gets* . . . .' " (*Thomas, supra,* 85 Cal.App.4th at pp. 118–119, italics added.)

*Thomas* involved a brazen admission of such egregious misconduct that it presented a rare situation where judicial estoppel should be applied even though the bankruptcy court did not rely on the debtor's nondisclosures. Here, there is no admission, brazen or otherwise. Further, Shashi's judgment debtor testimony was not submitted to the courts in the earlier litigation for any type of ruling, while the bankruptcy schedules in *Thomas* were filed with the bankruptcy court to obtain a discharge of debts. And *Thomas* was decided before the Supreme Court emphasized the importance of the success factor in *New Hampshire, supra,* 532 U.S. at pages 749–751, and *Zedner, supra,* 547 U.S. at pages ___–___ [126 S.Ct. at pages 1987–1988].

Nor does *International Engine Parts, supra,* 64 Cal.App.4th 345, support defendants' position. That case, like *Thomas,* involved false statements made in a prior bankruptcy proceeding. The court commented that "where parties to an action pending in our courts have been properly shown to have been less than sufficiently forthcoming in another tribunal, the doctrine of judicial estoppel is available to maintain the integrity of our judicial system." (*Id.* at p. 354.) But the plaintiff in *International Engine Parts* satisfied the success factor: The bankruptcy court accepted the truth of the inaccurate bankruptcy filings by confirming the debtor's plan of reorganization. (See *id.* at pp. 348–349, 353; *In re An-Tze Cheng* (Bankr. 9th Cir. 2004) 308 B.R. 448, 453–454 [for purposes of judicial estoppel, success in bankruptcy proceeding includes confirmation of reorganization plan], affd. mem. (9th Cir. 2005) 160 Fed.Appx. 644.)

B. *Other Equitable Considerations*

 The nature of the prior proceedings here—judgment debtor examinations—counsels against application of judicial estoppel for another reason.

Intentional misrepresentation in a judgment debtor exam frustrates the goal of compensating the injured, namely, the judgment creditors, who may or may not be parties in the subsequent action. Shashi's theory of liability in this case—he has been a partner in the Partnership and a part owner of its properties since 1995—suggests that his judgment debtor testimony was false. And any recovery here may provide a source of funds Shashi should have disclosed at the debtor exams. Thus, the interests of Shashi's judgment creditors—nonparties in this action—are implicated.

Judgment debtor examinations, like bankruptcy proceedings, are concerned with compensating creditors. Judicial estoppel cases involving prior bankruptcy proceedings often emphasize the interests of nonparty creditors. " '[The] decisions [applying judicial estoppel to statements made in earlier bankruptcy proceedings] rely primarily upon the well-established requirement that a debtor seeking the benefits of bankruptcy must fulfill the companion duty of fully disclosing and scheduling all property interests and rights so that the bankruptcy court and *creditors* can make an informed decision about the debtor's proposed reorganization plan.' " (*Billmeyer v. Plaza Bank of Commerce* (1995) 42 Cal.App.4th 1086, 1091–1092 [50 Cal.Rptr.2d 119], italics added; accord, *Krystal Cadillac-Olds GMC Truck v. General Motors* (3d Cir. 2003) 337 F.3d 314, 323.)

"[R]eliance by *creditors* is the whole point of the disclosures required in a [bankruptcy] proceeding, and disclosure has been described as the central concept in a reorganization procedure. 'The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the *creditors* and the court.' " (*Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 152 [53 Cal.Rptr.2d 336], fn. omitted, italics added, overruled on another point in *Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 92–94 [111 Cal.Rptr.2d 711].) "*Creditors* and the bankruptcy court must rely on the integrity of the debtors in order for the bankruptcy system to successfully function." (*International Engine Parts, supra,* 64 Cal.App.4th at p. 353, italics added; accord, *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.* (3d Cir. 1996) 81 F.3d 355, 362.)

"Judges understandably favor rules that encourage full disclosure in bankruptcy. Yet pursuing that end by applying judicial estoppel to [bar this action] would have adverse effects on third parties: the creditors. [The debtor's] nondisclosure in bankruptcy harmed his creditors by hiding assets from them. Using this same nondisclosure to wipe out [the debtor's present] claim would complete the job by denying creditors even the right to seek some share of the recovery. . . . Judicial estoppel is an equitable doctrine, and using it to land another blow on the victims of bankruptcy fraud is not an equitable application." (*Biesek v. Soo Line R. Co.* (7th Cir. 2006) 440 F.3d 410, 413.)

" 'Equitable' in this context refers more to fairness and discretion than to the technical distinction between law and equity. . . . It follows that the fashioning of a remedy to implement a judicial estoppel must be grounded on notions of fairness and preventing injustice. . . .

"Preventing injustice and furthering notions of fairness are entrenched equitable principles that need to be taken into account whenever fashioning a remedy in the nature of estoppel. [¶] It is a maxim of equity that a court of equity seeks to do justice and not injustice. It will not do 'inequity in the name of equity.' . . . Nor will it do 'unjust or inequitable things.' " (*In re An-Tze Cheng, supra,* 308 B.R. at p. 459, citations omitted.) "The equitable balance compels consideration of whether the economic consequences of a judicial estoppel are borne by third parties." (*Id.* at p. 460.) "The challenge is to fashion a remedy that does not do inequity by punishing the innocent." (*Id.* at p. 459.)

In light of the foregoing principles, our analysis should not be limited to the interests of Shashi and defendants. This case has broader equitable implications than a simple two-sided dispute. As in the bankruptcy context, the victims here may include the nonparty creditors. In the present action, Shashi contends he is owed $250 million in Partnership profits and assets for work dating back to 1995. In the 1998 judgment debtor examinations, he did not disclose the existence of, or his connection to, the Partnership. After the debtor exams, the plaintiffs in *Cappucci* and *Weyerhauser* "sold" their judgments for pennies on the dollar. Ironically, those settlements were funded by the Partnership or a Partnership Entity.

If the judgment creditors were misled by Shashi's testimony at the debtor examinations, they may have a fraud claim for damages or rescission of the settlements. (See, e.g., *Campbell v. Birch* (1942) 19 Cal.2d 778, 790–793 [122 P.2d 902] [money damages available where judgment creditor entered settlement based on debtor's misrepresentations about assets]; *Bank of America v. Greenbach* (1950) 98 Cal.App.2d 220, 222–225, 227–228 [219 P.2d 814] [settlement by judgment creditor may be rescinded and judgment reinstated where settlement was induced by debtor's fraudulent statements about assets]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 285–286, 930–945, pp. 314–316, 1026–1039 [remedies for fraud]; 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, §§ 125–126, 148, pp. 192–193, 218 [same]; Civ. Code, §§ 1689, subd. (b), 1691–1693 [requirements for rescission of contract].) And the judgment creditors may be able to share in any damages Shashi recovers in this action. (See *Bank of America v. Greenbach, supra,* 98 Cal.App.2d at pp. 236–239.)

Of course, the judgment creditors settled with Shashi several years ago, which raises a question about the timeliness of any fraud claims. Typically, an

action for fraud must be brought within three years of the plaintiff's discovery of the facts constituting the fraud. (Code Civ. Proc., § 338, subd. (d).) An action seeking rescission of a written contract based on fraud must be brought within four years of the discovery of the fraud. (*Id.*, § 337, par. 3.)

With respect to the discovery of fraud, it has been said: "[A] party has a duty to investigate where he has notice of facts which indicate fraud. . . . But this duty to investigate is a relative matter. The [judgment] creditor has a legal right to rely upon the statements made by the debtor. If the debtor is guilty of deliberate fraud, it is not good morals, nor does it make good sense or good law, to say that the creditor was too credulous because he placed too much reliance on the statements made by the fraudulent debtor, and is therefore barred.

"[A] debtor seeking to compromise an admitted debt must make a full and complete disclosure, and must exercise the utmost good faith. . . . '[G]ood faith requires the debtor, before he shall be permitted to profit by a [settlement] agreement, to make a full and fair disclosure of his effects, and . . . no concealment, deception or fraud should be practiced.' . . . [¶] . . . [¶]

". . . ' "The courts will not lightly seize upon [the statute of limitations] to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him on the ground . . . that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part." ' " (*Bank of America v. Greenbach, supra*, 98 Cal.App.2d at pp. 233–236; see *Samuels v. Mix* (1999) 22 Cal.4th 1, 9–16 & fn. 3 [91 Cal.Rptr.2d 273, 989 P.2d 701] [discussing "discovery rule" applicable to fraud claims].) In this case, we do not speculate about when the statute of limitations might begin to run as to any particular judgment creditor.

In general, the trial court may fashion appropriate judicial estoppel remedies to protect the interests of any judgment creditor who might have been misled by Shashi's judgment debtor testimony. (See *In re An-Tze Cheng, supra*, 308 B.R. at p. 461 [trial court should fashion "a suitable judicial estoppel remedy . . . that does not wound bystanders"]; *id.* at pp. 459–461 [discussing creation of judicial estoppel remedies]; *Krystal Cadillac-Olds GMC Truck v. General Motors, supra*, 337 F.3d at p. 319 [remedy of judicial estoppel must be " 'tailored to address the harm identified' "]; *In re Lopez* (Bankr. 9th Cir. 2002) 283 B.R. 22, 26–27 & fn. 9, 28–30 & fn. 12 [cautioning courts not to bar civil actions based on plaintiff-debtor's inconsistent statements in prior bankruptcy proceedings if barring action would deny

creditors opportunity to share in proceeds of potentially meritorious action]; see also *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203] [discussing courts' inherent powers].)

Shashi virtually concedes that a trial court has broad authority to shape equitable remedies under the doctrine of judicial estoppel, stating on appeal he is willing to waive the statute of limitations in certain respects as to the judgment creditors in *Cappucci* and *Weyerhauser*. But regardless of Shashi's voluntary offer, a trial court has the authority to *impose* judicial estoppel remedies to protect the *Cappucci* and *Weyerhauser* creditors as well as any other judgment creditors in similar circumstances.

As stated, Shashi's judgment creditors are not parties to this action. How and when a trial court should protect their interests is somewhat hypothetical at this point. The record does not indicate whether the judgment creditors even know about Shashi's allegations and testimony in this action or his potential recovery against defendants. We think it appropriate for the trial court, at a minimum, to develop a means of notifying the judgment creditors in *Cappucci* and *Weyerhauser* and similarly situated judgment creditors that they may have an interest in the progress of this litigation. (See *In re Lopez, supra,* 283 B.R. at pp. 26–27 & fn. 9, 28–30 & fn. 12 [where debtor took inconsistent position in subsequent civil action after receiving discharge in bankruptcy court, judicial estoppel did not preclude chapter 7 trustee from reopening bankruptcy proceedings and notifying creditors to file claims based on previously concealed asset].)

Finally, the defendants in the present case are *not* judgment creditors but alleged coparticipants in the undisclosed Partnership. They suffered no harm from Shashi's judgment debtor testimony and will not incur an "unfair detriment" if this action is allowed to go forward. (See *New Hampshire, supra,* 532 U.S. at p. 751.)

Accordingly, we conclude that judicial estoppel does not bar this action because Shashi's debtor exam testimony was not adopted or accepted as true by the courts in the judgment debtor proceedings, that is, he did not successfully assert his prior position. In addition, Shashi's claims in this case may benefit any judgment creditors who were defrauded as a result of his debtor exam testimony.

Our conclusion finds support in *Ezzone v. Hansen* (Iowa 1991) 474 N.W.2d 548, where the Iowa Supreme Court rejected the application of judicial estoppel to judgment debtor examinations. The court stated: "It is a function of adversary litigation to ferret out the truth of conflicting positions. Although harsh consequences should attend the giving of false testimony, we see no

need to include among such consequences an arbitrary forfeiture of property to the benefit of [the defendants,] who were in no way prejudiced by the falsehoods. Moreover, to apply the doctrine in the present case could work to the disadvantage of innocent third parties who might have been prejudiced if the testimony in the prior proceedings was in fact false. These parties may now be in a position to lay claim to assets that plaintiff has concealed should his contentions in the present litigation prove to be correct." (*Id.* at p. 550.)[5]

In an effort to save their judicial estoppel defense, defendants argue that Shashi made prior inconsistent statements other than during the judgment debtor examinations. First, in a verified answer in a prior action (*Cappucci v. Jogani* (Super. Ct. L.A. County, 1998, No. BC185434)), Shashi denied the allegations that (1) "such a unity of interest and ownership" existed between him, his wife, and certain Partnership Entities that they did not have "separate personalities," and (2) adherence to the "fiction" of separate personalities would "sanction a fraud and promote injustice." But Shashi has not changed positions on these issues. He has never contended that the Partnership or the Partnership Entities did not have a separate existence or that his conduct gave rise to a fraud or an injustice. Because there is no inconsistency between the verified answer and Shashi's position in this case, judicial estoppel does not apply. (See *Aguilar, supra,* 32 Cal.4th at p. 987; *Daar & Newman v. VRL International, supra,* 129 Cal.App.4th at p. 491.) And defendants point to no evidence that the denials in the verified answer were adopted or accepted as true by the court in which the answer was filed.

Second, in connection with a case filed in San Diego (*Creditors Adjustment Bureau, Inc. v. Jogani* (Super. Ct. San Diego County, 1997, No. 593037)), Shashi signed a declaration under penalty of perjury stating he had "no interest" in H.K. Realty or certain other companies, nor was he owed any consulting fees. Defendants cite no evidence that the declaration was ever filed with the court, much less that the court acted on it. Thus, the declaration is subject to the same judicial estoppel analysis as Shashi's judgment debtor testimony.

Last, defendants contend that Shashi's 1995 written consulting contract with J.K. Properties is inconsistent with his position in this case because the contract refers to him as a "consultant" and an "independent contractor" and states he is not a "partner" or "joint venturer." The contract also states that

---

[5] In *Kauffman-Harmon v. Kauffman* (2001) 2001 MT 238 [307 Mont. 45, 36 P.3d 408], the Montana Supreme Court reached the opposite conclusion. We decline to follow *Kauffman* because it did not consider whether the judgment debtor testimony had been adopted or accepted as true *by the court* (as opposed to the judgment creditors), nor did it adequately protect the judgment creditors' interests in a possible recovery if the plaintiff-debtor prevailed in the subsequent action. (See *id.* 307 Mont. at pp. 51–52 [36 P.3d at p. 412].)

Shashi's compensation as a consultant constitutes "full" payment for his services to the corporation. Similarly, defendants point out that Shashi and his personal attorney sent letters to financial institutions stating Shashi had no ownership interest in the Partnership Entities, presumably so the entities could qualify for loans. Nevertheless, the contract and the letters were not made under oath or considered by the courts in any prior litigation. Consequently, they provide a less compelling argument for judicial estoppel than the judgment debtor testimony. (Cf. Evid. Code, § 622 [codifying common law doctrine of "estoppel by *contract*": facts recited in written instrument are conclusively presumed to be true as between parties thereto].)

In sum, Shashi's allegations and deposition testimony in this action are totally inconsistent with the statements he made in the judgment debtor examinations. Yet, the substance of his judgment debtor testimony was not considered by the courts that ordered the exams; the courts did not evaluate it, rely on it, adopt it, or accept it as true. No court has been misled by the testimony, nor is there even a slight possibility of inconsistent outcomes. The task of assessing the truth of the earlier testimony will fall in the first instance to the trier of fact in this action. Defendants may offer that testimony into evidence in an attempt to defeat Shashi's claims on the merits.

The judgment creditors, none of whom is a defendant here, may benefit if Shashi is allowed to proceed with the present action. Shashi's theory of liability in this case would support a claim that the judgment creditors were defrauded by his debtor exam testimony, and, if defrauded, they may be entitled to damages or rescission of the settlements. A victory for Shashi could well mean a victory for the judgment creditors.

We are loath to condone perjury. Prosecutions for perjury are rare. And the sanctity of the oath, by itself, does not ensure that all judgment debtors will be completely forthcoming during a judgment debtor examination. But the doctrine of judicial estoppel should not be stretched beyond its limited purpose: to protect the integrity of the judicial process, primarily by precluding a party from taking inconsistent positions that pose a risk of inconsistent court determinations. There is no such risk here. We do not suggest judicial estoppel can never apply to judgment debtor examinations, but simply conclude the doctrine does not apply in this case. The trial court erred in granting summary judgment.

## III

## DISPOSITION

The judgment is reversed. Appellant is entitled to costs on appeal.

Spencer, P. J., and Ashmann-Gerst, J.,* concurred.

A petition for a rehearing was denied July 27, 2006, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied October 11, 2006, S145938.

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.